# In re Jesus COLLADO-Munoz, Respondent

## File A31 021 716 - York

### *Decided as amended February 26, 1998[1]*

#### U.S. Department of Justice
#### Executive Office for Immigration Review
#### Board of Immigration Appeals

(1) A lawful permanent resident of the United States described in sections 101(a)(13)(C)(i)-(vi) of the Immigration and Nationality Act (to be codified at 8 U.S.C. § 1101(a)(13)(C)(i)-(vi)) is to be regarded as "seeking an admission into the United States for purposes of the immigration laws," without further inquiry into the nature and circumstances of a departure from and return to this country.

(2) The Immigration Judge erred in finding that the *Fleuti* doctrine, first enunciated by the United States Supreme Court in *Rosenberg v. Fleuti*, 374 U.S. 449 (1963), requires the admission into the United States of a returning lawful permanent resident alien who falls within the definition of section 101(a)(13)(C)(v) of the Act, if that alien's departure from the United States was "brief, casual, and innocent."

FOR RESPONDENT: Stephen D. Converse, Esquire, York, Pennsylvania

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Jeffrey T. Bubier, Assistant District Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman, DUNNE, Vice Chairman, VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, GUENDELSBERGER, and JONES, Board Members. Dissenting Opinion: ROSENBERG, Board Member.

HOLMES, Board Member:

The Immigration and Naturalization Service appeals from a May 21, 1997, decision of an Immigration Judge that ordered terminated, without prejudice, the present removal proceedings against the respondent.[2] The dispositive issue in the Immigration Judge's opinion was whether the doctrine of "brief, casual, and innocent" departure from the United States first enunciated by the United States Supreme Court in *Rosenberg v. Fleuti*, 374

---

[1] On our own motion, we amend the December 18, 1997, order in this case to include the dissenting opinion.

[2] As the alien is named in a Notice to Appear (Form I-862), the proper term for such a person is "respondent." 62 Fed. Reg. 10,312, 10,330 (1997) (to be codified at 8 C.F.R. § 1.1(r)) (interim, effective Apr. 1, 1997).

U.S. 449 (1963), has survived the enactment of section 301(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-575 ("IIRIRA").[3] The Immigration Judge concluded that the *Fleuti* doctrine was applicable to this case and ordered the proceedings terminated. The Immigration Judge's decision will be vacated, and the record remanded for further proceedings.

## I. FACTS

The respondent, a native and citizen of the Dominican Republic, is a lawful permanent resident of the United States and has been for over 25 years. On April 7, 1997, upon his return to the United States after a 2-week visit to his native country, he was charged by the Service with inadmissibility under section 212(a)(2) of the Immigration and Nationality Act (to be codified at 8 U.S.C. § 1182(a)(2)), based on a 1974 conviction for sexual abuse of a minor. At the hearing before the Immigration Judge, and in the Immigration Judge's decision, the focus was on the continuing applicability of the *Fleuti* doctrine and on the character of the respondent's departure. Although the respondent acknowledged that he had been convicted on July 24, 1974, of sexual abuse of a minor in the second degree and received "three years probation," the issue of whether or not he had committed an offense identified in section 212(a)(2) of the Act was not specifically addressed and resolved. Rather, the Immigration Judge, relying on *Rosenberg v. Fleuti, supra*, terminated removal proceedings, determining that the respondent had made only a "brief, casual, and innocent" departure from the United States. The Service appealed, arguing that the respondent was properly charged as an arriving alien who was inadmissible despite his lawful permanent resident status, because, applying section 101(a)(13)(C)(v) of the Act (to be codified at 8 U.S.C. § 1101(a)(13)(C)(v)), the respondent must be regarded as "seeking an admission" into the United States.

## II. ISSUE

The issue before us in this case is whether the Immigration Judge correctly decided that the *Fleuti* doctrine permits or requires the admission into the United States of a returning lawful permanent resident who falls within the definition of section 101(a)(13)(C)(v) of the Act, if the lawful permanent resident's departure from the United States was "brief, casual, and innocent." Or, stated otherwise, whether a lawful permanent resident described in sections 101(a)(13)(C)(i)-(vi) of the Act is to be regarded as "seeking an admission into the United States for purposes of the immigration laws," without

---

[3] While the dissent urges that this "is not the real issue before us," this in fact was the basis of the Immigration Judge's decision in this case, which is now before us on appeal. *Matter of Collado*, 21 I&N Dec. 1061, 1069 (BIA 1998)(Rosenberg, dissenting).

further inquiry into the nature and circumstances of a departure from and return to this country.

## III. STATUTES

Shortly before the respondent's return to the United States, the laws of this country concerning entry were changed with the enactment of the IIRIRA. Previous to this enactment, "entry" was defined at section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13)(1994), as follows:

> The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary . . . .

This definition was the one considered by the Supreme Court in *Rosenberg v. Fleuti, supra.* However, by the time of the respondent's return to the United States on April 7, 1997, this definition of entry was no longer in effect. Instead, section 101(a)(13) of the Act was effectively amended as of April 1, 1997, to define the terms "admission" and "admitted." Section 101(a)(13), as amended by the IIRIRA, now provides, in relevant part:

> (A) The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.
>
> . . . .
>
> (C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien —
>
> (i) has abandoned or relinquished that status,
>
> (ii) has been absent from the United States for a continuous period in excess of 180 days,
>
> (iii) has engaged in illegal activity after having departed the United States,
>
> (iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,
>
> (v) has committed an offense identified in section 212(a)(2), unless since such offense the alien has been granted relief under section 212(h) or 240A(a), or
>
> (vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.

## IV. ANALYSIS AND CONCLUSION

Section 101(a)(13) of the Act is a definitional provision that has been completely revised by Congress through the IIRIRA. Section 301(a) of the

IIRIRA amended section 101(a)(13) of the Act by entirely supplanting the definition of "entry" with definitions for the terms "admission" and "admitted." Section 101(a)(13)(C) specifically addresses the treatment of lawful permanent residents in the restructured statutory scheme. We read that section, in keeping with its definitional character, to create a dichotomy. It specifies a general rule that an alien lawfully admitted for permanent residence is not regarded as seeking admission. It then specifies the exceptions to the general rule, specifically, the circumstances under which a lawful permanent resident will be regarded as seeking an admission. In our judgment, it would be inconsistent with the definitional nature of this provision to read it, as does the dissent, to create either a third category or an undefined second category of lawful permanent residents who may or may not be regarded as seeking an admission, depending on a wholly unspecified set of criteria that, presumably, would be developed by case-by-case adjudication.[4] Rather, we find that the plain language of this definitional provision compels the finding that, under section 101(a)(13)(C)(v) of the Act, a lawful permanent resident who has committed an offense identified in section 212(a)(2), who has not since such time been granted relief under sections 212(h) or 240A(a) (to be codified at 8 U.S.C. § 1250a(a)), who departs the United States and returns, shall be regarded as seeking an admission into the United States despite his lawful permanent resident status.[5]

Moreover, we do not find that a contrary result is mandated by the Supreme Court's decision in *Rosenberg v. Fleuti, supra*. Aside from the fact that neither an Immigration Judge nor this Board has the authority to rule

---

[4] We note that Congress is clearly aware of the concept of "brief, casual, and innocent" absences, as it previously incorporated this concept in other provisions of the Act. *See, e.g.*, sections 244(b)(2), 245A(a)(3)(B), 8 U.S.C. §§ 1254(b)(2), 1255a(a)(3)(B)(1994). However, no general exception for "brief, casual, and innocent" absences was included in section 101(a)(13), as amended by the IIRIRA. In fact, the previous use of the "brief, casual, and innocent" concept in section 244(b)(2) of the Act, pertaining to eligibility for suspension of deportation, was not carried forward by Congress in the IIRIRA's new cancellation of removal provisions. Rather, section 240A(d) of the Act (to be codified at 1250a(d)) sets forth specific "special rules" relating to continuous residence or physical presence.

[5] The dissent argues that the "plain meaning" of section 101(a)(13)(C) is clear and unambiguous, and that it simply specifies those returning lawful permanent residents who may *not* be regarded as seeking admission, rather than providing by definition a statutory "bright line" for determining which returning lawful permanent residents shall be considered to be seeking admission. As discussed above, we obviously do not agree that this is the "plain meaning" of this definitional provision or the meaning that is compelled by its grammatical construction. Given the plain language of this provision and its placement in a definitional section, not in a discretionary relief provision, for example, such a reading of the statute strikes us as exceedingly strained. In our view the dissent cannot acknowledge any ambiguity in this statutory language because this is an instance, perhaps rare, in which the legislative history makes clear that this language was intended to reach precisely the opposite result of that advanced by the dissent. The amended definition was intended to preserve only "a portion" of the *Fleuti* doctrine. *See* legislative history cited *infra* note 6. It was not enacted, in effect, to

upon the constitutionality of the laws we administer, the amended section 101(a)(13)(C) of the Act no longer defines the term "entry" and no longer contains the term "intended," which formed the central basis for the Supreme Court's reasoning in *Rosenberg v. Fleuti*. Instead, the amended section specifically defines the circumstances under which a returning lawful permanent resident will be deemed to be seeking admission into the United States. Thus, we find that the *Fleuti* doctrine, with its origins in the no longer existent definition of "entry" in the Act, does not survive the enactment of the IIRIRA as a judicial doctrine. Rather, Congress has now amended the law to expressly preserve some, but not all, of the *Fleuti* doctrine, as that doctrine developed following the Supreme Court's 1963 decision.[6]

For example, under section 101(a)(13)(C)(ii) of the Act any absence of a lawful permanent resident for a continuous period in excess of 180 days is now determinative of whether the alien is to be deemed to be seeking admission, but absences of shorter duration will not be of any consequence in this regard. Section 101(a)(13)(C)(v) categorizes certain lawful permanent residents as seeking admission to the United States who may otherwise have fallen within the parameters of the "brief, casual, and innocent" departure category, as the parameters of that category have been developed in case law subsequent to *Rosenberg v. Fleuti, supra. See, e.g., Zimmerman v. Lehmann,* 339 F.2d 943 (7th Cir.)(holding that *Fleuti* protected from exclusion proceedings an alien who had a previous criminal conviction and attempted to enter the United States without proper documentation), *cert. denied*, 381 U.S. 925 (1965); *Matter of Quintanilla-Quintanilla*, 11 I&N Dec. 432 (BIA

---

expand that doctrine and to provide a more generous starting point from which it would be determined whether a returning lawful permanent resident should be treated as an alien seeking admission. Moreover, the understanding of the drafters of this provision was that this language "stat[ed] that a returning lawful permanent resident alien *is seeking admission* if the alien . . . has entered the United States . . . without inspection." *Id.* (emphasis added). Thus, it is clear that this language was intended to define which returning lawful permanent residents would and would not be treated as seeking admission into the United States. The Joint Explanatory Statement of the Committee of Conference, accompanying the Conference Report on H.R. 2202, states that "[w]ith certain specified exceptions (including in the case of an individual who . . . has committed an offense identified in section 212(a)(2)), a returning lawful permanent resident alien . . . shall not be considered to be seeking admission." H.R. Rep. No. 104-2202, § 301(a), *available in* 1996 WL 563320 and 142 Cong. Rec. H10,841-02.

[6] The ultimately enacted definition in section 101(a)(13)(C) of the present law has its origins in earlier House bills. *See* H.R. 2202, 104th Cong. § 301 (1996). The Report of the Committee of the Judiciary of the House of Representatives issued in conjunction with H.R. 2202 reflects that the amendment to section 101(a)(13) was intended "to preserve *a portion* of the *Fleuti* doctrine . . . . However, this section intends to overturn certain interpretations of *Fleuti* by stating that a returning lawful permanent resident alien *is seeking admission* if the alien is attempting to enter or has entered the United States without inspection . . . ." H.R. Rep. No. 104-469, pt. 1, at 225-26 (1996) (emphasis added)(footnotes omitted). The ultimate language enacted by the IIRIRA was largely identical to, but somewhat *more* restrictive than, the language in section 301(a) of H.R. 2202.

1965). And section 101(a)(13)(C)(vi) of the Act makes clear that any departure of a lawful permanent resident followed by an entry into the United States without inspection will be a meaningful departure.

The Supreme Court, in *Rosenberg v. Fleuti*, stated that "Congress unquestionably has the power to exclude all classes of aliens from this country, and the courts are charged with enforcing such exclusion when Congress has directed it." *Rosenberg v. Fleuti, supra*, at 461. Here, in the revised version of section 101(a)(13)(C) of the Act, we consider a congressional directive not contained in the previous version of that section and not before the Supreme Court when it decided *Fleuti*. The plain reading of this amended law is that Congress has directed that a returning lawful permanent resident who is described in sections 101(a)(13)(C)(i)-(vi) of the Act shall be regarded as "seeking an admission" into the United States, without regard to whether the alien's departure from the United States might previously have been regarded as "brief, casual, and innocent" under the *Fleuti* doctrine. Further, we find that as an "applicant for admission" to the United States, such an alien is subject to a charge of inadmissibility under section 212(a) of the Act. *See* section 240(c)(2)(A) of the Act; 62 Fed. Reg. 10,312, 10,368 (1997) (to be codified at 8 C.F.R. § 240.8(b)) (interim, effective Apr. 1, 1997).[7] We note that in an analogous situation under prior law, the Supreme Court held that Congress could provide in the case of a returning lawful permanent resident that the determinations of both "entry" and the existence of exclusion grounds could be made at an exclusion hearing. *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

Accordingly, the decision of the Immigration Judge will be vacated and the record will be remanded for further proceedings, at which time it should be determined whether the respondent has committed an offense as identified in section 212(a)(2) of the Act and is inadmissible under that section of law.[8] If so, it should be determined whether the respondent is eligible for and warrants any relief from removal.

Finally, because we find that the Immigration Judge's basis for terminating the removal proceedings in this case was in error, his order directing the release of the respondent from custody on that basis is vacated. *See* 62 Fed.

---

[7] Because the Immigration Judge terminated proceedings on *Fleuti* grounds, he did not reach—and the parties did not otherwise address—the proper allocation of the burden of proof once an alien seeking admission to the United States establishes that he or she is a lawful permanent resident. Accordingly, that issue is not at present before us in this case.

[8] On appeal the respondent argues that his crime does not constitute an aggravated felony as defined at section 101(a)(43) of the Act. This determination does not affect the outcome of our decision, as he is charged with excludability as an alien who has committed a crime involving moral turpitude. We note that the respondent states that he has included his conviction documents with his appeal, but no such documents are in the record of proceedings or included with the respondent's appellate submission.

Reg. 10,312, 10,360 (1997) (to be codified at 8 C.F.R. § 236.1(c)(5)) (interim, effective Apr. 1, 1997); *see also* 8 C.F.R. § 3.19(d) (1997).

**ORDER:** The May 21, 1997, decision of the Immigration Judge is vacated.

**FURTHER ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

Board Member Gustavo D. Villageliu did not participate in the decision in this case.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

The matter before us presents an extremely important case involving the fundamental rights and liberty interests of the respondent, who is a lawful permanent resident ("LPR") of more than 25 years, in which the stakes are undeniably high. It raises the critical issue of what individual protections and procedures under the immigration laws must be afforded a lawful permanent resident who presents himself to immigration inspectors upon his return to this country from a brief, casual, and innocent trip abroad and is alleged to be subject to removal.

I find that there are two parallel questions presented. The first question is, what is the meaning of section 101(a)(13)(C) of the Immigration and Nationality Act, as amended by the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA")(to be codified at 8 U.S.C. § 1101(a)(13)(C)), and how is it best interpreted consistent with relevant constitutional considerations?

In other words, what does it mean to make a blanket statement in the statute that all persons already lawfully admitted for permanent residence *are not to be treated* as though they are seeking to be admitted, and then to list six categories in which the mandatory rule that lawful permanent residents are not to be so treated does not apply? Does it mean that those falling into the six categories *may be treated* as seeking to be admitted despite their lawful resident status, or does it mean that they *must be treated* as seeking to be admitted?

In particular, the statute specifically mandates that certain permanent residents "*shall not* be regarded as seeking admission, *unless*" one of six enumerated circumstances apply. See section 101(a)(13)(C). Apart from this threshold enunciation, however, the statute is silent and does not mandate any particular treatment in the event that one or more of such circumstances do apply to a lawful permanent resident.

The second question is, may the Immigration and Naturalization Service enforcement arm charge a returning lawful permanent resident as an "

arriving" alien—that is, as an individual seeking to be admitted to the United States—with impunity? In other words, despite the fact that the designation as an arriving alien ultimately affects fundamental rights that warrant a due process hearing and review at the agency level, does the statutory language require a reading that leads to the conclusion that it is the Service's call as to who is and who is not an "arriving" alien, completely insulated from review by an Immigration Judge or the Board of Immigration Appeals?

The majority insists on taking the position that it is deciding this case on the most narrow of grounds, determining only whether or not the "*Fleuti* doctrine" continues to exist following enactment of the IIRIRA. It is true that the statute, as amended by the IIRIRA, codifies, in part, certain, specific aspects of the doctrine that grew out of the decision in *Rosenberg v. Fleuti*, 374 U.S. 449 (1963) ("*Fleuti* doctrine"). However, the *Fleuti* doctrine means, at the very least, that so long as the law differentiates between those who are already permanently and lawfully *here*, and those who are *seeking to be here,* an individual who is a lawful permanent resident who returns to this country after a departure that is brief, casual, and innocent should not be treated as though he or she were seeking admission to this country, solely because he or she ventured abroad. *See also Landon v. Plascencia*, 459 U.S. 21 (1982); *Jubilado v. INS*, 819 F.2d 210 (9th Cir. 1987); *Yanez-Jacquez v. INS*, 440 F.2d 701 (5th Cir. 1971).

The majority's conclusion that, apart from codification of some of its aspects by implication in section 101(a)(13)(C) of the Act, the *Fleuti* doctrine has ceased to exist, is without any basis in the statute as amended, and, in fact, is contrary to the language of the statute. I cannot agree, as the majority concludes, that the statutory language or its necessary interpretation, creates an absolute dichotomy in which a returning lawful permanent resident either may not be treated as an arriving alien, or must be so treated. *Cf. Matter of Collado*, 21 I&N Dec. 1061, 1064 (BIA 1998). Instead, I read the statute as leaving open to an impartial adjudicator the determination of how to treat a lawful permanent resident to whom one or more of six circumstances do apply. That determination, which I believe remains subject to the consideration of factors developed following the Supreme Court's decision in *Rosenberg v. Fleuti, supra*, and a variety of other discretionary considerations, is not for the Service, the prosecuting party, to make. It is for the quasi-judicial decision-maker—either the Immigration Judge or the Board—to assess and adjudicate.

I therefore conclude that the majority has erred in interpreting the statutory language, and, as a result, improperly abdicated our adjudicatory authority, contrary to law and regulation. Consequently, I dissent.

## I. FRAMING THE ISSUE

The statute presently provides for a single proceeding, called a removal hearing, in which the Service may prosecute its allegations and charges against a noncitizen, and it is in this proceeding that such allegations and charges shall be determined. *See* sections 240(a)(3), (e)(2) of the Act (to be codified at 8 U.S.C. §§ 1229a(a)(3), (e)(2)). The respondent, who is a lawful permanent resident of the United States, is charged only with being inadmissible under section 212(a)(2)(A)(I) of the Act (to be codified at 8 U.S.C. § 1182(a)(2)(A)(I)) for having been convicted of a crime of moral turpitude. Therefore, if it is determined that it is inappropriate to treat the respondent as an arriving alien, he would not be subject to charges of inadmissibility and it would be proper for an Immigration Judge to terminate the proceedings as the Immigration Judge did here.[1]

Although the majority begins its opinion by stating that the "dispositive issue" is whether *Rosenberg v. Fleuti, supra*, "has survived" the enactment of the IIRIRA, that is not the real issue before us. *Matter of Collado, supra*, at 1062.[2] The real issue is whether the statute *requires* that a lawful permanent resident who departed and returned to the United States in a manner that can be characterized as brief, casual, and innocent, or otherwise not meaningfully disruptive of his lawful permanent resident status, *must be treated* as an "arriving alien" as that term is used in the IIRIRA, merely because the Service has elected to charge him under one of the categories that constitute exceptions to the statutory mandate that a returning lawful permanent resident *may not* be treated as an arriving alien seeking admission.

The critical corollary to this principal issue is, as implicitly stated by the majority, whether the statute *mandates* that we (i.e., the Immigration Judges and the Board of Immigration Appeals, who make up the quasi-judicial bodies determining issues involving removal arising under the Immigration and

---

[1] It might be argued that if a person is found not to be "seeking admission," the court should enter its finding and proceed on the basis of that finding, rather than terminate the case, since there is now only one proceeding, removal, rather than the two that existed previously (exclusion and deportation). Section 240(a)(3) of the Act; *see also* section 240(e)(2) of the Act. The Service has the option of charging an individual under any provision of the Act it believes to have been violated, and it is beyond the scope of this opinion to address whether the principles of res judicata would bar the Service from recharging an individual with a ground of deportability should charges of inadmissibility be terminated, as I believe they should be here.

[2] Indeed, the majority equivocates about the real issue, acknowledging later in its opinion that the issue is whether the *Fleuti* doctrine itself either "*permits or requires*" the admission to the United States of a returning lawful permanent resident as defined in the new section 101(a)(13)(C)(v) of the Act if the respondent's departure is "brief, casual and innocent." *Matter of Collado, supra*, at 1062. (emphasis added). Moreover, the majority finally settles for framing the issue as whether the return of a lawful permanent resident described in sections 101(a)(13)(C)(I)-(vi) of the Act "*is to be* regarded as 'seeking an admission . . .' *without further inquiry into the nature and circumstances of a departure from and return to* this country." *Id*. (emphasis added).

Nationality Act) are required to accept the Service's characterization of the returning resident's status "without further inquiry into the nature and circumstances of the departure from and return to" made by the lawful resident alien. *Matter of Collado, supra*, 1062-63. In other words, may the Service unilaterally determine, without a hearing of any sort and without regard to the nature of the lawful resident's departure and return, that he is to be treated as an arriving alien for purposes of determining which charges are brought against him, how the burden of proving those charges shall be allocated, what relief may be available to him, and what the statute allows or requires in terms of detention pending resolution of those charges? This question has both practical and constitutional implications.

Although I note the potential for conflict with the United States constitution, both in terms of an absolute standard differentiating the treatment of lawful permanent resident aliens who briefly depart and return to the United States and those who do not, and a reading of the statute that essentially deprives a lawful permanent resident alien of the procedural due process protections, I recognize that we are not authorized to address the constitutionality of the laws we interpret and administer. We are, however, authorized and encouraged to construe these laws so as not to violate constitutional principles. My reading of the statute, unlike that of the majority, allows me to resolve the issue presented without raising constitutional concerns.

## II. CONSTRUCTION OF LANGUAGE IN THE STATUTE

It is my position that the plain statutory language, "shall not [be regarded as seeking admission] . . . unless [the individual is within one of six subcategories]," discussed below, mandates only that lawful returning residents who do *not* come within the six articulated subcategories *may not* be treated as seeking admission, and expressly leaves open for an individual determination made by an impartial adjudicator how others who *do* fall within those categories are to be treated. Nothing in the majority opinion directly addresses or refutes that straightforward reading of the statute. *Matter of Collado, supra*, at 1064-65 n.5. In fact, they state only that "[g]iven the plain meaning of this provision and its placement in a definitional section, not in a discretionary relief provision," reading the language literally strikes them as strained, and they ultimately acknowledge that the language is plain. *Id*. All that the majority's judgment—that it would be "inconsistent with the definitional nature of the provision"—means is that the majority is more comfortable reading the statute "plainly" as a "bright line" provision absolutely requiring treatment of an individual charged by the Service as an "arriving alien," i.e., as an individual who is regarded as seeking admission to the United States, rather than assessing a variety of relevant factors themselves before making that determination. *Id*. at 1064.

The ultimate resolution of the issues before us is not properly based on what the majority may prefer, or whether a straightforward reading of the statute (permitting, but not requiring, treatment of certain returning permanent residents charged by the Service as "arriving aliens") necessitates our engaging in an evaluation of various factors before determining whether it is appropriate to treat an individual so charged by the Service as seeking admission to the United States. The ultimate resolution depends on what the statute actually says.

## A. Specific Language in the Statute

Our focus must be on the language of the statute. If this language is plain, that ends the inquiry as to what Congress meant or intended. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984) (holding that when the plain meaning is clear, the inquiry ends: the court "must give effect to the unambiguously expressed intent of Congress"). We must assess the matter before us according to the plain language of the statutory section considered in the context of the statute as a whole. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *INS v. Phinpathya*, 464 U.S. 183, 189 (1984); *see also Matter of Fuentes-Campos*, 21 I&N Dec. 905 (BIA 1997).

In this case the language is clear and understandable according to common usage. It unambiguously mandates that an LPR shall *not* be regarded as "seeking admission" when none of the six conditions ((i) through (vi)) obtain. It unambiguously permits, but does not mandate, that an LPR *may* be regarded as "seeking admission" if one or more of the listed condition obtains. If Congress had intended to mandate that an arriving LPR *shall* be regarded as "seeking admission" when one of the six conditions obtain, it would certainly have enacted different language than it did.

The statute states in pertinent part:

> An alien lawfully admitted for permanent residence in the United States *shall not* be regarded as seeking an admission into the United States for purposes of the immigration laws *unless* the alien—
>
> . . . .
>
> (v) has committed an offense identified in section 212(a)(2), unless since such offense the alien has been granted relief under section 212(h) or 240A(a).

Section 101(a)(13)(C)(v). It is important to note that Congress did *not* state:

> An alien lawfully admitted for permanent residence in the United States *shall not* be regarded as seeking an admission into the United States for purposes of the immigration laws; *but if* the alien . . . (v) has committed an offense identified in section 212(a)(2), such alien *shall* be regarded as seeking admission.

There is no basis on which to conclude that Congress' silence in not mandating that individuals falling within the six exceptions must be treated as

arriving aliens is due to an "accident of draftsmanship." *INS v. Phinpathya, supra*, at 191.

The obvious meaning of the section, as worded, is that it is *mandatory* that a respondent *shall not* be deemed an "arriving alien" if he is a lawful permanent resident. Then, following this general proscription are six exceptions, introduced by the term "unless." The dictionary defines "unless" as "except under condition that." When attached to a proposition or rule, the term "unless" introduces a clause that states conditions under which that proposition or rule is no longer valid.

The Service's position in this case, which the majority has adopted, assumes that if one of the conditions following the term "unless" obtains, then the negative proscription—"*shall not* be regarded as an arriving alien"—becomes a positive one: "*shall* be regarded as an arriving alien." This assumption is clearly incorrect. "Unless" in the English construction "shall not . . . unless . . ." means that if the conditions stated are met, what follows the "shall not" becomes permissible but not mandatory. The succeeding paragraphs demonstrate that the conditions following the term "unless" are *necessary* in order to consider an LPR an arriving alien, but they are *not sufficient* to do so. Something more, which I believe in this case is a determination based on consideration of various individual factors relevant to the particular departure and the specific violation of the immigration law charged, is required before it is appropriate to treat an LPR as an arriving alien who is to be regarded as seeking admission.

Furthermore, the construction "shall not . . . unless" has this obvious meaning in legal parlance as well as in plain English usage. For example, in a condemnation proceeding instituted to acquire particular property, the court *shall not* order the party in possession to surrender possession in advance of final judgment *unless* certain conditions are met, such as the filing of a declaration of taking, and the submission of a deposit. 42 U.S.C. § 1594a(c)(2)(1994). If the conditions are met, the court is not mandated to order the property surrendered, but only authorized to do so. The court is prohibited from doing so if the conditions following "unless" are not met. The language of our constitution, as well as that of other statutes and judicial decisions, provides additional examples, including:

(1) A writ of habeas corpus "*shall not* be granted *unless* . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1994)(emphasis added). Exhausting state remedies is a necessary condition precedent to granting the writ in federal court, but is obviously not sufficient to obligate the federal court to issue the writ.

(2) Article I, section 9, clause 2 of the Constitution provides: "The Privilege of the Writ of Habeas Corpus *shall not* be suspended, *unless* when in Cases of Rebellion or Invasion the public Safety may require it." (Emphasis added.) Even if there is a rebellion, and even if public safety may require suspending the right, those situations in themselves do not mandate a suspension

but only permit it. (This construction does not depend on the use of the term "may" but on the meaning of "shall not . . . unless." If, for instance, the last clause were changed to simply say, "except in cases of rebellion or public safety," the whole English sentence would still only *permit* and *not mandate* suspension of the right when the condition is met).

(3) "[E]vidence of the defendant's ability to pay *shall not* be admitted *unless* and until the party entitled to recover establishes a prima facie right to recover [punitive damages]." Or. Rev. Stat. § 30.925(2) (1993)(emphasis added). Once the right to recover punitive damages is established, the party *may*, but is *not required* to, submit evidence about the opponent's ability to pay.

(4) Under the Federal Tort Claims Act an "action *shall not* be instituted . . . *unless* the claimant shall have first presented the claim to the appropriate . . . agency." 28 U.S.C. § 2675(a)(1994)(emphasis added). A claimant who has first presented the claim to the appropriate agency is *permitted* but *not required* to bring a federal suit.

(5) "'[A] physician *shall not* perform an abortion upon [a woman less than 18] *unless* . . . he first obtains the informed consent both of the pregnant woman and of one of her parents . . . .'" *Planned Parenthood v. Casey*, 505 U.S. 833, 904 (1992)(quoting 18 Pa. Cons. Stat. § 3206 (1990))(emphasis added). A physician receiving such consent is *not obligated* by this language to perform an abortion once the conditions are met, but is only *permitted* to do so, while being *prohibited* from doing so if the condition is *not* met.

## B. Placement Within the Statute

The fact that the statutory section we are charged with considering is found within a definitional subsection of the statute does not insulate it from being construed as possessing something other than an absolute or unequivocal meaning as applied. The majority provides no authority for so concluding. To the contrary, there are countless definitional subsections of the Immigration and Nationality Act that have been found to require extensive interpretation. In fact, the Supreme Court's decision in *Rosenberg v. Fleuti, supra,* involved the responsibility of the judiciary to interpret and apply on a case-by-case basis, the meaning of a definitional section of the statute. *See* section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13)(1994).

Since that time, two of the most prominent of these definitions include the definition of what constitutes an aggravated felony warranting removal from the United States and the definition of who is to be considered a refugee entitled to protection in the United States. Each of these definitions, and certainly the latter, have been extensively interpreted by the Supreme Court, the lower federal courts, and this Board. In the course of these interpretations or their applications to individual cases, no such protestations were raised by any adjudicatory body that, as the majority posits here, because the language was

found in definitional sections of the statute, these definitions were appropriately construed as creating an "either/or" dichotomy, or meaning one and only one thing. *Cf. INS v. Cardoza-Fonseca, supra* (acknowledging and even mandating that the further development of the definition would necessarily be at the agency level); *Matter of Mogharrabi*, 19 I&N Dec. 437 (BIA 1987) (acquiescing in the ruling in *INS v. Cardoza-Fonseca.*)

Therefore, even were the language, or its grammatical construction, less than plain, I cannot agree with the majority that "it would be inconsistent with the definitional nature of this provision" to read the as amended statute as providing, as an exception to the rule that a returning lawful permanent resident shall not be regarded as seeking admission, a category of lawful permanent residents who may or may not be regarded as seeking admission. *Matter of Collado, supra*, at 1064. The fact that inclusion in this category would depend on the quasi-judicial bodies of the agency, such as the Immigration Judges or this Board, making determinations in individual cases that would be subject to "a wholly unspecified set of criteria that, presumably, would be developed by case-by-case adjudication," is not a rational reason to read the statute contrary to its specific terms. *Id*. Adjudicating individual cases and developing criteria that go on to serve as guidelines to fair and consistent adjudications in future cases is what we do.

## III. INTERPRETATION AND APPLICATION OF THE PROVISION

At least three additional points support the plain reading of the statuary language as I posit it above. First, Congress is presumed to be aware of existing law when it amends a statute, and Congress did not expressly overrule the decision in *Rosenberg v. Fleuti, supra*, or any of its progeny. *McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 481 (1991); *cf.* former section 244(b)(2) of the Act, 8 U.S.C. §1254(b)(2) (1988), added by Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 315(b), 100 Stat. 3359, in which Congress expressly indicated its intent to overrule the Supreme Court's 1984 decision in *INS v. Phinpathya, supra*.

In fact, the spirit of the *Fleuti* doctrine has been preserved in the IIRIRA by the express inclusion in the statute itself of conditions pertaining to a returning resident's maintenance of his lawful status, the length of his absence, and the lack of his having engaged in illegal activity after departing, under which it is mandatory that he *not* be treated as an arriving alien. This codification in section 101(a)(13)(C) of certain of the criteria in the *Fleuti* doctrine creates a clear, objective bottom line not requiring case-by-case consideration of the character of the returning resident's absence. For example, any LPR who leaves the United States for 179 days can rest assured that it is mandatory that he or she *shall not* be considered an "arriving alien" upon

returning to the United States (provided that none of the other conditions obtain).

The fact that this codification establishes a mandatory bottom line or threshold consistent with the spirit of the *Fleuti* doctrine, however, does not support a conclusion that the doctrine is inapplicable to persons not coming under the mandatory protection of the statute. As noted, the statute is utterly silent as to the continued vitality of the *Fleuti* doctrine. Therefore, if the LPR remains outside the United States for 181 days, he or she runs the same risk as before the law was amended, when establishing entitlement to being treated as though no departure and entry had occurred required a case-by-case determination that the departure was brief, casual, and innocent.

In addition, the fact that the *Fleuti* doctrine originated in the course of interpreting a statute in which the terminology was "seeking to enter," or "making an entry," rather than "seeking to be admitted" does not preclude the applicability of the criteria contained in that doctrine under the present statute. The doctrine has taken on a life of its own.

Under either version of the statute, it is generally advantageous to the returning resident not to be treated as making an entry or seeking to be admitted. Avoiding such a classification acknowledges the greater ties with this country possessed by a permanent resident and it affords that individual the benefit of more preferred treatment and greater opportunities available to noncitizens already within this country.

Under the present statute, the adjudicator is not limited to considering only those criteria associated with the *Fleuti* doctrine in determining whether a returning resident who *may* be treated as an arriving alien, *will* be treated as such. A returning resident, like the respondent, who may have committed or been convicted of a crime listed in section 212(a)(2) of the Act, is not included in the mandatory prohibition against being regarded as "seeking admission." We *may*, therefore, find a particular LPR who has been convicted of such a crime to be "seeking admission." This determination will depend on the presence or absence of various factors attendant to both the nature of the departure and the violation in question. The length and purpose of the departure, the time the conviction occurred in relation to the departure, the action or inaction of the Service with regard to the conviction prior to the departure, the nature of the crime, the fact of or lack of rehabilitation, and other factors that might touch on the safety and well-being of people in the United States, including family members, are each relevant to this determination. *See Marincas v. INS*, 92 F.3d 195 (3d Cir. 1996)(recognizing that minimum due process procedures due under a statutory right depend on the circumstances).

Second, the Board has observed that the Supreme Court requires us to consider the plain meaning of the words used in the statute "taken as a whole." *Matter of Fuentes-Campos, supra* (citing *INS v. Cardoza-Fonseca, supra,* at 431). This raises a final consideration that convincingly demonstrates that it

is *permissible but not mandatory* to consider the returning LPR as seeking admission if one of the conditions (i) through (vi) obtains.

If we were to read the Act as if its language meant "*shall be* considered an arriving alien if . . ." rather than "*shall not . . . unless,*" an obvious anomaly would be presented: an LPR returning from a brief stay abroad, who had committed or had been convicted of a crime and then been admitted as an LPR or had deportation waived would *not* be eligible for consideration as a person who had been admitted, but would *necessarily* be regarded as a person "seeking admission." The only waivers explicitly recognized in section 101(a)(13)(C)(v) of the Act as superseding the application of the clause following "shall not" are waivers under sections 240A(a) and 212(h) of the Act (to be codified at 8 U.S.C. §§ 1229b(a) and 1182(h)).

Under the majority's absolutist reading of the statute, waivers granted under section 212(c), and adjustment of status under section 245 of the Act (to be codified at 8 U.S.C. § 1255) would not be recognized. This would mean that an individual who had been admitted for lawful permanent residence following a conviction *must* be treated as an "arriving alien" although his past commission of an offense already had been examined and either waived or determined not to render him inadmissible.

We have stated clearly and without equivocation that an individual who may be deportable for a given offense, but whose status is adjusted is no longer deportable for that offense. *Matter of Rainford*, 20 I&N Dec. 598 (BIA 1992); *Matter of Rafipour*, 16 I&N Dec. 470 (BIA 1978); *cf. Matter of V-*, 1 I&N Dec. 273 (BIA 1942). We also have recognized previously that an alien who has been granted a waiver of a ground of deportability is neither deportable or excludable, meaning that he would not be removable today. *Matter of Gabryelsky*, 20 I&N Dec. 750 (BIA 1993). Assuming that revisiting a status determination by charging an individual with a violation of the Act for the same conduct underlying a violation of the Act we have waived ever would be appropriate, it would be the rare occasion on which there would be any reasonable basis to treat such an individual as an "arriving alien" as opposed to simply charging him with being deportable.

Third, in a closely related context, the Service recently has acknowledged that the statute does not mandate a reading that an LPR *must* be treated as an arriving alien. *See U.S. Release Immigrant Jailed for a 1974 Misdemeanor,* N.Y. Times, Oct. 25, 1997. In revising its interpretation of the Transitional Period Custody Rules ("TCPR") and finding that it has authority to parole such persons as the respondent, the Service has stated in a memorandum to the field: "[E]ffective immediately for purposes of detention under the TCPR only, the Service will regard as 'lawfully admitted' any applicant for admission who remains in status as a lawful permanent resident . . . ." *See* "Parole Authority for Certain Returning Residents Who Have Committed Criminal Offenses," Oct. 22, 1997.

Manifestly, if the Service has elected, in the face of the statutory language of section 101(a)(13)(C) of the Act, to assert its authority to treat a returning resident who has committed a criminal offense as "lawfully admitted" for purposes of satisfying eligibility requirements for release from detention, then the statute cannot require that every lawful returning resident who comes within one of the six exceptions must be treated as an arriving alien.[3] Putting aside the qualifications imposed by the Service in this memorandum—that this interpretation is only for purposes of determining eligibility for release from detention and that only the Service can make such a determination—it seems to me necessary, unless the Service is acting unlawfully, to conclude that the statute allows a returning resident to be treated other than as an arriving alien.

Finally, as I indicated in my dissent in *Matter of N-J-B-*, 21 I&N Dec. 860 (BIA 1997), if at all ambiguous, deportation statutes must be read to favor the noncitizen. In addition, if there is any ambiguity concerning the reach of the statutory language, we should be cognizant of the rule that courts must give a restrictive interpretation "if a broader meaning would generate constitutional doubts." *United States v. Witkovich*, 353 U.S. 194, 199 (1957).

Here, under the majority's interpretation, treatment of LPRs who have traveled legally outside the United States would be significantly worse than treatment of those who have not departed. Not only may the latter group be free from Service custody (with access to review by an Immigration Judge) pending a final determination of their right to remain in the United States, but they are not vulnerable to charges of having committed certain offenses, and must actually have been convicted of such offenses before being charged with being removable. I can find no rational basis in the law for such a distinction, and consequently, I believe that a serious equal protection issue is raised by the course taken by the majority. *See generally Francis v. INS*, 532 F.2d 268 (2d Cir. 1976).

The statute as amended does not *require* anything more than that we, as adjudicators, engage in a process of assessing whether the individual circumstances of a lawful permanent resident alien who is alleged to fall within one of the six conditions that constitute an exception to the mandatory prohibition against regarding him as an arriving alien who is seeking admission *should*

---

[3] The issue of eligibility to seek release from Service custody on a bond is linked to the ultimate finding of whether a person is an "arriving alien" under the regulation at 62 Fed. Reg. 10,312, 10,330 (1997)(to be codified at 8 C.F.R. § 1.1(q)) (interim, effective Apr. 1, 1997) (defined as any alien who "seeks admission" to the United States), because the Attorney General's regulations provide that review by an Immigration Judge "shall not apply with respect to: (I) arriving aliens, as described in § 1.1(q) of this chapter . . . in removal proceedings." *Id*. at 10,361 (to be codified at 8 C.F.R. § 236.1(c)(5)). Respondents other than arriving aliens may apply to an Immigration Judge for "amelioration of terms of release" at any time before a final order is entered under 8 C.F.R. § 240. *Id*. (to be codified at 8 C.F.R. § 236.1(d)(1)).

be treated as though he is seeking admission. As adjudicators, we are to exercise our judgment as to whether the character of the departure made by a lawful permanent resident alien and other relevant factors warrant allowing the Service to treat that individual as seeking admission to the United States and to establish admissibility, or whether the Service must pursue any alleged violation of the immigration law by charging the individual with being deportable and bearing the burden of proving the alien deportable and subject to removal on that basis. *See Landon v. Plasencia, supra.*

## IV. CONCLUSION

We need not distort the plain reading of the statute, which by mandate precludes treating some lawful permanent residents as "arriving aliens" and follow the Service's overzealous approach, when the statute allows us the opportunity to exercise our quasi-judicial judgment in the case of a returning lawful resident who is not within the statutory mandate. We should, instead, exercise our judgment, beginning with a supportable reading of the statute according to its language. That reading requires an individual determination of whether a longtime resident such as this respondent, who is alleged to come within the terms of section 212(a)(2) of the Act, should be treated as "arriving" or "admitted."

I believe that the Immigration Judge was correct in determining that, although we are not prohibited from treating this respondent as an "arriving alien," it is not appropriate to do so. Because the Immigration and Naturalization Service charged the respondent as an inadmissible alien when, in fact, he should be treated as being within the United States, the charges they have brought must fail and the Immigration Judge's decision should be upheld.